IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE GUZMAN-CRUZ and JUAN GABRIEL BELTRAN,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br><br>Case No. 2:14-CR-61<br><br>Judge Dee Benson |

This matter is before the court on defendant Jose Guzman-Cruz' Motion to Suppress. (Dkt. No. 21.) On October 3, 2014, the court conducted an evidentiary hearing on the motion. The defendant, Jose Guzman-Cruz, was present with his counsel, Greg S. Law. Michael Langford appeared on behalf of co-defendant Juan Gabriel Beltran, who joined in Guzman-Cruz' motion, but waived his right to be present at the evidentiary hearing. The government was represented by Veda M. Travis. Following the hearing, the court ordered a transcript and set a briefing schedule. After review and consideration of the memoranda submitted by the parties

1

and the testimony presented at the evidentiary hearing, the court enters the following Memorandum Decision and Order.

## BACKGROUND

The court finds the relevant facts as follows.[1] Jared Withers is a trooper with the Utah Highway Patrol (UHP), having served with that agency for nine years. (Tr. at 5-6.) Withers is currently assigned to the Green River area in Emery County, Utah, where he patrols Interstate 70. (Tr. at 6.) Since 2008, Trooper Withers has been assigned to UHP's part-time criminal interdiction team which focuses on drug interdiction as well as the interdiction of threats and other crimes on Utah's highways. (Tr. at 6.) Trooper Withers is also a K-9 handler, and has worked as a K-9 handler from 2008 - 2010 and from 2012 to the present. (Tr. at 7.) Withers currently works with a Belgian Malinois named Marco who is a dual-certified police dog, certified in both narcotics detection and human apprehension. (Tr. at 7.) With regard to narcotics detection, Marco has been trained to detect the odors of marijuana, methamphetamine, cocaine and heroin. (Tr. at 7.) When Marco detects such odors, he gives an aggressive indication by barking, biting or scratching. (Tr. at 7-8.)

Trooper Withers has been certified by Utah POST as a police dog handler. (Tr. at 8.) He was originally certified in 2008 and recertified in 2012. (Tr. at 9.) Marco, his K-9, has been certified by Utah POST as a narcotics dog. (Tr. at 8.) He was initially certified in 2010 and Trooper Withers has certified Marco three times since then – in November 2012, January 2013 and January 2014. (Tr. at 8.) Marco receives eight hours of ongoing training each week

---

[1]Reference to the transcript of the evidentiary hearing conducted on October 3, 2014, will be cited as "Tr. at __."

consisting of four hours for narcotics detection and four hours for criminal apprehension. (Tr. at 8.) Trooper Withers considers Marco to be a reliable narcotics dog. (Tr. at 8.)

On November 25, 2013, just after noon, Trooper Withers was on duty, running stationary radar on I-70 approximately three miles west of Green River in Emery County. (Tr. at 9.) Withers was parked in the median, facing west so he could observe eastbound traffic. (Tr. at 9.) Withers observed a black Nissan truck approaching, traveling 71 miles per hour. Because the speed limit at that location is 75 mph, Withers did not initially pay much attention to the truck. (Tr. at 9.)

As the truck continued to approach Withers' location, the truck slowed down to 64 mph. (Tr. at 9-10.) Trooper Withers found that to be unusual. (Tr. at 9-10.) Turning his attention to the truck, Withers observed a crack going almost entirely across the center of the windshield. (Tr. at 10.) As the truck passed, Withers also noticed that the window tinting was very dark, so dark in fact that as the vehicle passed, he could not see any of its occupants. (Tr. at 10.)

The cracked windshield and window tint were both violations of Utah law. (Tr. at 10-11.)

Based on his observation of the traffic violations, Trooper Withers initiated a traffic stop on the black Nissan truck at approximately 12:02 p.m. (Tr. at 11-12.) The vehicle immediately pulled over. (Tr. at 12.) Trooper Withers approached the truck from the passenger side. The passenger window was rolled down and he observed two males; a driver and a front seat passenger. (Tr. at 12.)

Trooper Withers spoke to the driver, explaining that he had stopped the truck because of

the dark windows and the crack in the windshield; he added that the driver needed to have the windshield replaced. (Tr. at 12.) When Withers mentioned the window tint, the passenger turned to the driver and said, "I told you the windows were too dark." (Tr. at 12.)

Trooper Withers asked the driver for his license, but the driver just stared at him. (Tr. at 13.) It was obvious to Withers that English was not the driver's first language. (Tr. at 13.) Withers asked for the license again and the passenger then told the driver to give Withers his license. (Tr. at 13.) The driver began to "laugh a little bit," and Trooper Withers asked, "do you understand English," to which the driver responded, "a little bit." (Tr. at 13.) The passenger then stated, "yeah, he understands English." (Tr. at 13.)

The driver produced a California driver's license in the name of Jose Guzman-Cruz (hereinafter "Guzman"). (Tr. at 13.) The license contained a photo that appeared to match the driver. (Tr. at 13-14.) As Guzman was giving Trooper Withers the license, Withers noticed that Guzman's hand was shaking very badly. (Tr. at 13.) Withers also noticed that the driver's carotid artery on the side of his neck was pounding visibly. (Tr. at 15.) Withers then asked if the two men were friends and the passenger replied that they were cousins. (Tr. at 13.)

Trooper Withers also asked for the vehicle registration and proof of insurance. (Tr. at 14.) While Guzman was gathering those documents, Withers asked where the two men were going. (Tr. at 14.) The passenger replied that they were going to Colorado to see "the grandma" for Thanksgiving. (Tr. at 14.) Withers then asked what part of Colorado they would be visiting and the passenger replied "Denver." (Tr. at 14.)

The passenger also appeared nervous to Trooper Withers. (Tr. at 14.) Withers believed

his breathing was becoming labored, his face was beginning to sweat and he appeared to be shaking. (Tr. at 15.)

In Trooper Withers' experience, people are somewhat nervous when he pulls them over. (Tr. at 15.) He acknowledged that he may see a shaking hand on occasion, but stated that he usually does not see the pounding carotid, the sweating or the labored breathing on a normal traffic stop. (Tr. at 15.) In Withers' opinion, those are extreme signs of nervousness that cannot be controlled. (Tr. at 15.)

Before receiving the registration and proof of insurance, Trooper Withers asked Guzman who owned the truck. (Tr. at 15-16.) Guzman hesitated and then said the owner was Jorge Serrano. (Tr. at 16.) Withers asked if Serrano was a friend and Guzman replied that Serrano was his father's cousin. (Tr. at 16.) The passenger then commented that the passenger's mother and Guzman's mother were sisters. (Tr. at 16.)

Guzman was fumbling around with papers in the glove box so Trooper Withers asked him for the registration and proof of insurance a second time. (Tr. at 16.) Guzman then handed Withers the documents and Guzman's hand was shaking more than previously. (Tr. at 16.) Withers asked Guzman why he was shaking so badly and Guzman replied, "No, no, no." (Tr. at 16.) Withers looked at the registration and the registered owner was Jorge Serrano. (Tr. at 16-17.)

Trooper Withers then asked Guzman to turn off the truck and asked if Guzman would come back to the patrol car with him. (Tr. at 17.) Guzman agreed but remained in the truck. (Tr. at 17.) Withers believed that Guzman had not fully understood his question and, therefore,

5

Withers re-worded the question. (Tr. at 17.) Guzman responded, saying "oh, okay" and exited the truck. (Tr. at 17.) Guzman then entered the front passenger seat of the patrol car. (Tr. at 17-18.) Withers also entered the patrol car. (Tr. at 18.) The time was approximately 12:05 p.m. (Tr. at 18.)

As soon as he entered the patrol car, Trooper Withers began drafting a citation on his laptop, filling in Guzman's personal information. (Tr. at 18.) As he was drafting the citation, Withers talked to Guzman, asking first if Guzman had a phone number or contact information for the registered owner. (Tr. at 18.) Guzman said the information was in his cell phone which was still in the truck. (Tr. at 18.) Withers asked Guzman if he had borrowed the truck just for the trip or if he drove the truck all the time. Guzman said he drove the truck all of the time. (Tr. at 18.) Withers then asked Guzman why the truck was registered to Serrano and Guzman said it was for the credit; Withers assumed that Guzman had bad credit. (Tr. at 18.)

Trooper Withers than asked Guzman how long he would be in Denver. (Tr. at 19.) Guzman did not appear to understand the question so Withers re-worded it and asked again. (Tr. at 19.) This time, Guzman understood and responded that he would be in Denver for three or four days. (Tr. at 19.) Withers asked who Guzman would see while in Denver and Guzman said "the grandma" as he pointed toward the passenger. (Tr. at 19.) Withers then asked if they were going to see the passenger's grandma and Guzman indicated they were. (Tr. at 19.) When Withers asked for the grandma's name, Guzman hesitated and after pausing said "Andre – Andreceta." (Tr. at 19.) Withers believed that Guzman did not know who they were going to see. (Tr. at 19.) When Withers asked if they were staying at the grandma's house, Guzman said

no. (Tr. at 19.) Guzman then said he had seen a car advertised online and, after visiting the grandma, he was going to buy the Chrysler he had found on the computer. (Tr. at 19.)

Guzman also told Trooper Withers that he worked at a bar. (Tr. at 20.)

At approximately 12:08 p.m., Trooper Withers contacted Price dispatch and asked the dispatcher to run a driver's license check, a warrants check and a criminal history on Guzman. (Tr. at 20.) From the time he entered the patrol car, up to this point, Withers had been working on the citation. (Tr. at 20.)

After contacting dispatch, Withers continued to talk to Guzman. (Tr. at 20.) Withers wanted to clarify with Guzman where he would be staying in Denver because Guzman had "gone off in a different direction" the first time Withers asked. (Tr. at 20.) Guzman again did not appear to know where he and his passenger would be staying. (Tr. at 20.) Withers tried to clarify by asking if they were staying at the grandma's house or at a motel. (Tr. at 20.) Guzman replied, "Oh, better the motel." (Tr. at 20.)

Trooper Withers reviewed the insurance card that had been provided by Guzman. (Tr. at 21.) The card showed that both Jorge Serrano and Jose Guzman were listed on the car. (Tr. at 21.)

At 12:10 p.m., Trooper Withers was still waiting to hear from dispatch regarding the records checks he requested. (Tr. at 21, 23.) While waiting for dispatch to respond, Withers got Marco out of the car and deployed Marco on the truck. (Tr. at 21.) As is his usual practice, Withers began the deployment at the front of the truck and worked counterclockwise. (Tr. at 21.) On the initial pass around the truck, Marco immediately stopped at the rear driver's-side

7

door.  (Tr. at 21.)  Marco crawled under the truck, sniffing the floor of the truck and the frame of the truck.  (Tr. at 21.)  Marco's body tensed up, his sniffing became more intense and his tail was wagging very fast.  (Tr. at 21-22.)  Based on his experience handling Marco, Withers believed Marco was alerting to drug odor.  (Tr. at 21.)

Marco then came out from under the truck and worked his way toward the front of the vehicle.  (Tr. at 22.)  On his second pass, Marco stopped again in the same area of the driver's-side rear door, and crawled almost entirely under the truck, sniffing very intensely along the frame.  (Tr. at 22.)  Marco gave his "final response" by scratching with both paws above his head, actually scratching on the frame of the truck.  (Tr. at 22.)  Based on that behavior, Trooper Withers concluded that Marco had aggressively indicated, pinpointing the source of drug odor. (Tr. at 22.)

Trooper Withers had deployed Marco on the truck because he was suspicious of criminal conduct based on Guzman's change in speed (slowing down from 71 mph to 64 mph), the third-party registration of the truck, the fact that he thought it unusual that two grown men were traveling at Thanksgiving instead of being with their own families, Guzman's uncertainty of the grandma's name, the fact that the two men apparently would not be staying with family, and the extreme nervousness of both Guzman and his passenger.  (Tr. at 22-23.)

After Marco indicated on the truck, Trooper Withers realized "this is no longer a simple traffic stop" and, based on the dog indication, Withers intended to search the truck.  (Tr. at 23.) Withers put Marco back in the patrol vehicle and went to speak with the passenger in the truck. (Tr. at 24.)  Withers asked the passenger if he had identification and the passenger handed him a

California ID card in the name of Juan Gabriel Beltran. (Tr. at 24.) Withers asked Beltran for the name of Beltran's grandma, whom Guzman had said the two were going to visit in Denver, and Beltran said "Gloria," which did not match the name given by Guzman. (Tr. at 24.) Withers then attempted to clarify with Beltran about whom he intended to visit and Beltran said they were visiting Guzman's grandma, and that her name was Gloria. (Tr. at 24.) Guzman had told Withers they were going to visit Beltran's grandmother. (Tr. at 24.)

Trooper Withers asked Beltran where he and Guzman were going to stay in Denver and he did not know. (Tr. at 24.) He then continued to say, "well, I guess at her house," but said he really didn't know, he was just along for the trip. (Tr. at 25.) Withers asked Beltran how long they would be in Denver and he said just until Thanksgiving; Beltran added that they wanted to be back by Friday or Saturday because they had other family coming. (Tr. at 25.)

Trooper Withers then asked Beltran for the name of the driver. (Tr. at 25.) Beltran seemed to have a hard time with the question and finally responded, saying "Edgar." (Tr. at 25.) When Withers asked for Edgar's last name, Beltran told him it was "Robles." (Tr. at 25.) Withers asked Beltran again if the driver's name was Edgar Robles and Beltran confirmed that it was. (Tr. at 25.) The driver's identification, however, showed the driver's name as Jose Guzman-Cruz. (Tr. at 25.)

Trooper Withers then asked Beltran how long he had known the driver. (Tr. at 25.) Beltran stated he had known the driver a long time, for years. (Tr. at 25.) Withers then mentioned that he thought the two men were cousins and Beltran said they were. (Tr. at 25.)

Beltran appeared to Trooper Withers to be extremely nervous at this point. (Tr. at 25-

26.)  Beltran was sweating and his carotid artery appeared to be pounding in his neck.  (Tr. at 26.)  As he and Withers were talking, his voice became higher, he had labored breathing and it appeared his body was shaking.  (Tr. at 26.)

Trooper Withers then returned to his patrol car and requested backup.  (Tr. at 26.)  He knew that Deputy Blake Gardner of the Emery County Sheriff's Office was nearby, so he asked dispatch to have Gardner respond.  (Tr. at 26.)  Withers also asked dispatch to run a warrants check and criminal history on Beltran.  (Tr. at 26.)  Deputy Gardner arrived within six or seven minutes.

Trooper Withers asked Guzman if he knew the passenger's name and Guzman said the name was Juan Beltran.  (Tr. at 26-27.)  Withers then asked Guzman how long he had known Beltran.  Guzman said he had known him his whole life – they were cousins.  (Tr. at 27.)

Trooper Withers then explained to Guzman that his dog was trained to alert or indicate to drug odor and that the dog was alerting to Guzman's truck.  (Tr. at 27.)  Withers then asked Guzman if there were illegal drugs in the truck.  When Withers asked about marijuana, cocaine and heroin, Guzman, who was still sitting in the front passenger seat of the patrol car, audibly responded "no" to each.  (Tr. at 27.)  When Withers asked if there was any methamphetamine in the vehicle, Guzman turned away and replied so quietly that Withers could barely hear him.  (Tr. at 27.)  Given Guzman's reaction, Withers asked again, saying "are you sure there is no meth in the truck?"  Guzman responded "sure."  (Tr. at 27.)

Trooper Withers then asked Guzman if he could search the truck and Guzman quickly replied yes.  (Tr. at 27.)  The time was approximately 12:15 p.m.  (Tr. at 28.)  After Guzman had

given consent, and while Trooper Withers was continuing to wait for information from dispatch, Guzman insisted twice that Withers check the entire truck. (Tr. at 28.) He also told Withers that he was a good person and that he had children. (Tr. at 28.)

Although Guzman was not fluent in English, Trooper Withers believed that Guzman understood him for the most part throughout their encounter and that Guzman had no trouble understanding him when Withers asked for consent to search. (Tr. at 17, 27-28.)

Trooper Withers then asked dispatch to contact the El Paso Intelligence Center, EPIC, to see if EPIC had any information regarding the truck, Guzman or Beltran. (Tr. at 28.) Withers continued talking to Guzman, asking if Guzman had ever been arrested. (Tr. at 28.) Guzman said he had been arrested once for using cocaine at a party and that he had been sentenced to probation. (Tr. at 28-29.)

Trooper Withers then asked Guzman to step out of the patrol car while he searched the truck. (Tr. at 29.) Given the cool weather conditions, Withers retrieved Guzman's jacket from the truck. While taking the jacket back to Guzman, Withers checked the pockets and felt a small bundle. (Tr. at 29.) Withers reached into the pocket and retrieved a crumpled up receipt wrapped around a plastic baggie containing a white powder. (Tr. at 29.) Withers asked Guzman what it was and Guzman replied it was cocaine. (Tr. at 29.) Withers asked if the jacket belonged to Guzman and Guzman responded that it did. (Tr. at 30.) Withers then placed Guzman under arrest for possession of cocaine. Withers handcuffed Guzman and placed him in the front passenger seat of the patrol car. (Tr. at 30.)

Withers then asked Deputy Gardner to have Beltran exit the truck so they could conduct

a search. (Tr. at 30.) Beltran was placed in Wither's patrol car in the prisoner transport seat located directly behind Guzman in the front passenger seat. (Tr. at 30.)

Trooper Withers then removed an external microphone he wears on his uniform and placed it on the console of his patrol car in order to record any conversation that might take place between Guzman and Beltran. (Tr. at 31.)

Trooper Withers then began to search the truck, beginning with the passenger compartment. (Tr. at 31-32.) He did not see anything unusual so he looked under the truck in the area where Marco had indicated. (Tr. at 32.) Withers saw scratches on the frame of the truck where Marco had scratched when he indicated to drug odor. (Tr. at 32.) Also on the frame, Withers saw a palm print with two fingerprints where someone had apparently grabbed the side of the frame. (Tr. at 32.) On the other side of the frame rail, Withers saw the gas tank. (Tr. at 32.)

Trooper Withers crawled under the truck and began inspecting the plastic fuel tank which is secured by two straps that are bolted to the tank. (Tr. at 32.) There were signs that the tank had recently been removed – portions of the straps were clean and portions were dirty, and the bolts had recent tool marks from wrenches or sockets being placed on the bolts. (Tr. at 32.) The hose clamp on the filler tube was shiny and clean and had tooling on it where the clamp appeared to have been recently removed. (Tr. at 32.) The bottom of the fuel tank had recent scratches that were clean – it appeared to Withers that a jack or something had been underneath the tank to help lower it. (Tr. at 32-33.)

At that point, Trooper Withers was fairly certain the gas tank contained contraband. (Tr.

at 33.) In his experience, fuel tanks are commonly used to traffic drugs. (Tr. at 33.) Withers asked Beltran if he would be willing to drive the truck to the UHP office, approximately three miles away, and Beltran agreed. (Tr. at 33.) Deputy Gardner led the way and Withers followed the truck with Guzman who was in custody. (Tr. at 33.)

The truck was driven to UHP's Green River office where Withers used a fiberoptic scope to look inside the gas tank. (Tr. at 33.) When Withers looked through the scope toward the front of the tank, he saw a vacuum sealed package. (Tr. at 33.) He also had Deputy Gardner look through the scope and Gardner indicated that he thought he saw two packages. (Tr. at 34.) While this was being done, Beltran had been removed from the truck and was again sitting in the rear prisoner transport seat of Wither's patrol car. (Tr. at 33.) Once Withers saw the package in the gas tank, he handcuffed Beltran and placed him under arrest. (Tr. at 34.)

The officers were unable to remove the gas tank at the UHP office so they took it across the street to First Choice Automotive where they were able to put the truck on a lift. (Tr. at 34.) With the help of a mechanic, they were able to lower the gas tank. (Tr. at 34-35.) The officers removed the fuel pump to access the tank and found ten vacuum sealed packages inside the tank. (Tr. at 35.) Trooper Withers opened one package and field tested the contents. (Tr. at 35.)

As a result of this incident, on February 5, 2014, Guzman and Beltran were indicted for possession of methamphetamine with intent to distribute. (Dkt. No. 1.)

On June 16, 2014, defendant Guzman filed a motion to suppress the evidence in this case. Guzman contends the evidence was discovered as a result of an unlawful detention and in violation of the Fourth Amendment to the United States Constitution. (Dkt. No. 21.) Co-

defendant Beltran joined in Guzman's motion. (Dkt. Nos. 27 & 28.)

## DISCUSSION

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This prohibition on unreasonable searches and seizures is enforced through the exclusionary rule, which excludes evidence seized in violation of the Fourth Amendment. See Terry v. Ohio, 392 U.S. 1, 12 (1968) ("Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct.") It is this exclusionary rule on which Guzman's motion to suppress relies.

Specifically, Guzman argues that the evidence in this case should be suppressed for the following reasons: (1) Trooper Withers unreasonably detained him following the initial traffic stop; (2) Guzman's consent to search the truck was not freely and voluntarily given; and (3) the search of the gas tank violated the Fourth Amendment. (Def.'s Mem. in Supp. at 7-12.)

The defendant concedes that the stop and initial detention of the vehicle in this case were justified and therefore lawful based on the cracked windshield and excessive window tint. However, defendant asserts that the length of his detention was "unreasonably prolonged" and "without reasonable suspicion present" and thus became an unlawful detention under the Fourth Amendment. (Def.'s Mem. in Supp. at 8.) More specifically, defendant claims that Trooper Withers asked questions of the defendant that were "maneuvers [intended] to prolong the stop for a fishing expedition into whether [the trooper] could develop reasonable suspicion of drug activity. (Id. at 9.)

It is well-established that an investigative detention "usually must last no longer than is necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998). In accord, the United States Court of Appeals for the Tenth Circuit has instructed that "a law enforcement officer conducting a traffic stop 'may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate.'" United States v. Kitchell, 653 F.3d 1206, 1217 (10th Cir. 2011) (quoting United States v. Rosborough, 366 F.3d 1145, 1148 (10th Cir. 2004)). Additionally, "an officer may ask questions, whether or not related to the purpose of the traffic stop, if they do not excessively prolong the stop." United States v. Simpson, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010).

Nonetheless, a traffic stop may be expanded beyond the reason for its inception if an officer "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001). Whether an investigative detention is supported by reasonable suspicion "does not depend on any one factor, but on the totality of the circumstances." United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997). "[I]nchoate and unparticularized suspicion[s] or hunch[es] [are] insufficient to give rise to reasonable suspicion." United States v. Fernandez, 18 F.3d 874, 878 (10th Cir. 1994). But, "[c]ommon sense and ordinary human experience" are considered, and "deference is ... accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions." Wood, 106 F.3d at 946.

15

Applying these principles to the facts in this case, the court concludes that Trooper Withers did not prolong the detention of Guzman. Trooper Withers acted promptly, diligently and properly in obtaining the information he needed to accomplish the lawful purpose for which he stopped the defendant – to issue a citation or warning for the cracked windshield and window tint violations. During that time, Trooper Withers performed such reasonable tasks as: explaining to the defendant the reason for the stop; obtaining relevant information from the defendant including identification, vehicle registration and insurance information; beginning to draft a citation; inquiring about the third-party registered owner of the vehicle; and requesting a warrants check from dispatch. All of these are legitimate and reasonable inquiries. See United States v. Kitchell, 653 F.3d 1206, 1218 (10th Cir. 2011).

Significantly, it was during this time – as Trooper Withers was awaiting a response from dispatch regarding the warrants checks and within eight minutes of the initial stop – that Trooper Withers deployed Marco to perform a canine sniff the truck. "A canine sniff on the exterior of a vehicle during a lawful traffic stop does not implicate legitimate privacy interests." United States v. Williams, 403 F.3d 1203, 1207 (10th Cir. 2005). Because Marco's deployment and subsequent alert occurred during the course of these lawful and proper activities by Trooper Withers, the deployment of Marco cannot be said to have prolonged the stop. See Illinois v. Caballes, 543 U.S. 405, 408-09 (2005).

Moreover, even if it the deployment of Marco could somehow be said to have prolonged the initial stop and detention, Trooper Withers had, by that time, developed a reasonable suspicion of criminal activity based upon the following: the driving pattern prior to the stop; the

extreme nervousness of the defendant; the inconsistent information regarding the trip to Denver; and the third-party registration of the truck. See United States v. Cash, 733 F.3d 1264, 1274-75 (10th Cir. 2013). These factors, when viewed in their entirety, provided a sufficient basis to justify the minimal amount of time required to deploy the canine that was already on site.

Guzman also argues that his consent to search the truck was not freely and voluntarily given, and that the search of the truck's gas tank exceeded the permissible scope of the search. However, having already concluded that Marco alerted to the truck during the course of a lawful detention, the court need not reach these remaining claims. Once Marco alerted to the truck, Trooper Withers had probable cause to search and he no longer needed consent or a warrant in order for the search of the truck to be reasonable under the Fourth Amendment. See United States v. Sauzameda-Mendoza, 2014 WL 6873145, *7 (10th Cir. Dec. 8, 2014).[2]

Under the automobile exception, "[a] warrantless search of an automobile is reasonable if there is probable cause to believe it contains contraband." United States v. Ross, 456 U.S. 798, 809 (1982). It is a "well-established principle that a positive alert from a reliable narcotics-detection dog gives rise to probable cause to search a vehicle." Kitchell 653 F.3d 1206, 1222; see also United States v. Sauzameda-Mendoza, 2014 WL 6873145, *7 (10th Cir. Dec. 8, 2014)

---

[2]Although not necessary in this case, the court finds that Guzman's consent was freely and voluntarily given. As the videotape confirms, Trooper Withers' tone and demeanor were pleasant and non-threatening, and the stop took place during daylight, on a public highway. See United States v. Hernandez-Lizardi, 530 Fed.Appx. 676, 682 (10th Cir. 2013). Withers testified that the defendant understood his question regarding the search, and although defendant now claims in his memoranda that he did *not* understand, the defendant did not testify to that effect. (Tr. at 27-28.) Withers also testified that the defendant, on two occasions, insisted that he search the car. (Tr. at 28.) Moreover, Trooper Withers did not "use physical mistreatment, violence, promises, inducements, deception or trickery to coerce" the defendant into consenting to the search. Id. at 681-82.

(concluding that once canine alerted to truck and boat trailer the officer had probable cause to search both). Accordingly, once Marco – a certified and reliable narcotics detection dog – alerted to the presence of narcotics in the truck, Trooper Withers could search the entirety of the truck, including the gas tank,[3] without obtaining Guzman's consent.

Accordingly, and based on the foregoing analysis, defendant's motion to suppress is DENIED.

DATED this 11th day of January, 2015.

_____
Dee Benson
United States District Judge

---

[3] In his Reply Brief, the defendant appears to suggest that the search of the truck, if any, should have been conducted on the roadside and limited to the passenger compartment. The defendant claims it was improper to remove the truck from the roadside, dismantle it, and search the gas tank. In support of this argument, defendant relies on cases discussing the parameters for a warrantless search "incident to arrest." See Def.'s Reply at 3 (discussing Arizona v. Gant, 556 U.S. 332 (2009) and Chimel v. California, 395 U.S. 752 (1969)). Defendant's reliance on these cases is misplaced. Trooper Withers' search of the truck and gas tank was not a "search incident to arrest," but rather a warrantless search based on probable cause resulting from a positive alert from a reliable narcotics-detection dog. See United States v. Ludwig, 10 F.3d 1523, 1528-29 (10th Cir. 1993); see also Kitchell, 653 F.3d at 1222 (noting the "well-established principle that a positive alert from a reliable narcotics-detection dog gives rise to probable cause to search a vehicle"); United States v. Sauzameda-Mendoza, 2014 WL 6873145, *7 (10th Cir. Dec. 8, 2014) (extending this exception to search of a boat on a boat trailer).